IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

DANNY OVERTON CRUSE — PLAINTIFF

v. — Civil No. 05-2027

MIKE CONGER, Jail Administrator;
CPL. JUSTIN RITTER; DEPUTY
MIKE RESTINE; DEPUTY STAMPS;
and DEPUTY DARREN SCOTT — DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Before the undersigned for report and recommendation is the civil rights complaint filed by Danny Overton Cruse, currently incarcerated at the Franklin County Jail. Cruse proceeds pro se and *in forma pauperis*.

While detained at the Sebastian County Detention Center, Cruse contends his constitutional rights were violated when excessive force was used against him by the defendants. An evidentiary hearing was conducted on February 28, 2006. At the conclusion of the hearing, the matter was taken under advisement pending the preparation of this report and recommendation.

## I. BACKGROUND and EVIDENCE PRESENTED

Cruse was arrested for public intoxication at approximately 7:45 p.m. on February 3, 2005, by Officer Dewey Young and taken to the Sebastian County Detention Center (SCDC). Cruse was booked in on February 4, 2005, at 2:04 a.m. and released at 2:27 a.m. on a signature bond. During the time he was at the SCDC, Cruse contends he was assaulted by five officers.



AO72A
(Rev. 8/82)

At the evidentiary hearing, the court heard the testimony of a number of witnesses. For purposes of discussion, the court will summarize in the first person the testimony given.

***Joann Huntington***

Cruse is my brother-in-law. I am Patricia McMullen's daughter.

I was in my Mom's bedroom using her computer at the time Cruse was arrested. There had been an altercation between Cruse and my sister, Patsy Vaughn. Patsy is married to Cruse. I heard noise and came out of the bedroom and Cruse and Patsy were arguing. There was a lot of screaming and yelling going on. Cruse was screaming at my husband. Cruse called my husband by someone else's name.

I was told Cruse had pushed Patsy. I was told to call the police. I called the police and then went back into the bedroom.

Cruse was fine physically but he had been drinking quite a bit. Cruse and Patsy had only been back in town about a year when this happened. I didn't have that much contact with them.

I didn't witness the arrest. I didn't go to the jail.

***Charles Huntington***

Joann is my wife. I witnessed Cruse's arrest.

Danny and Patsy got into an argument. I was sitting at the kitchen table. He shoved her. She fell and hit her head on the ice box. He turned around and yelled at me. He called me by someone else's name.

The police came and told Danny to sit on the couch. They told him to stand up and put his hands behind his back. He did and they put cuffs on him. Danny was respectful to the police officer.



AO72A
(Rev. 8/82)

Danny had been drinking. He has problems seeing. He is blind in the left eye. When he starts drinking he gets flash backs about things that have happened to him and flips out.

I didn't go to jail. I didn't go to the hospital afterwards.

***Danny Overton Cruse***

I'm currently in the Franklin County Jail. I'm forty-nine years old. I have peripheral vision in my right eye. I have perforated retinas in both eyes.

I was arrested on February 2, 2005, at 7:45 p.m. Officer Dewey Young was the arresting officer.

I was sitting on a chair. I picked my wife up, she almost hit the ceiling fan, and then I dropped her. I fell back and sat on a 1910 Gibson guitar and broke it. The police came and said I caused an altercation.

Young started out being rough and belligerent. He reached for me and grabbed me up. He said put your hands behind your back. He grabbed me and pulled on me. My mother-in-law asked him if he had to be so rough. She told him he didn't have to be so rough. He was rude to my mother-in-law and my wife. He threatened to throw them in jail.

I was arrested inside the house. I was sitting in a chair in the front room. It is not true when Young states in his arrest report that he found me in the street. I don't remember anyone talking about sex.

Young jerked me outside the house. There are steps and I fell. He had a hard grip on me. He was pulling on me and I fell but I didn't hurt myself.

I was quite drunk. I wasn't inebriated. I could function. I had a few shots of vodka with my mother-in-law. I probably had four or five shots over a period of time.

When we got to the jail, Young pulled me out of the car. I was being escorted and the officer on the right pinched me with his hands. It felt like a horse bite. They took my property and then were escorting me to a cell. He pinched me and I flinched raising my arms up. When I flinched, they slammed me. They "dog piled" on me. There were between three to five officers involved. I have a good recollection of the events.

Under the SCDC use of force policy, if an inmate is argumentative, the inmate can be restrained. If an inmate lifts his arms up above his shoulders, he can be restrained. Because of the pinching, I flinched and raised my arms up. This gave them the go ahead.

I was immediately put in a cell. It was one of the first cells on the left. I immediately began kicking on the door with my left foot. I was upset with the way they had treated me. Someone came to the door. I was told to come there. When I did, I was grabbed by the hair and a taser put in my face. I was told I needed to quit arguing when them. I said I was being argumentative not combative.

I was taken to the recreation yard. I was left there in the freezing weather. I said I'm freezing to death in here. I said before I will let you kill me I will kill myself. It was so cold that when I breathed ice came out of my mouth.

I was arguing with the officers. They asked for my pants. I took them off and threw them. Once they did that, they "dog piled" on me again.

I was put in a cell again. I kicked on the door. They came and got me. They threw me ten foot in the air. I fell onto the concrete in the gymnasium. This was when I was taken from HC-3 to the recreation yard again. I landed on my right elbow. I had impact burns. I really don't know which officers pinched me or threw me.



AO72A
(Rev. 8/82)

I was taken to the infirmary. They came and got me out of the holding cell. I saw a young woman nurse. She asked me what happened. When I started to tell her the officers had beaten me up, they were leaning in towards me so I just said I fell.

I was let out at 2:30 a.m. I had no shirt. I didn't have a shirt on when I was arrested. I don't know why I didn't have a shirt on. I had jeans on. I had shoes on.

I told the officers I was visually impaired and needed help getting home. I didn't get help. I became lost. After at least a minimum of twenty or thirty minutes, some street officers called me a cab.

My wife had also been arrested on an old warrant. I waited and got her out and then I went to Sparks Regional Medical Center. It was 8:38 a.m. on February 4, 2005.

I didn't tell the people at the hospital what happened. I just said I fell and hit both my elbows on a cement floor. I didn't want to go into it with them. I was sick and sore and wanted treatment.

I did tell my doctor a good long story about what happened. The doctor had to drain my elbow.

My wife took these pictures. She took them either the evening after the hospital visit or the next morning. I believe it was the next morning.

I still have some problems with my elbows. They feel spongy, stiff, and get inflamed. I'll have to live with it the rest of my life. The problems with my right shoulder were temporary. My elbows hurt so bad my shoulder didn't concern me at the time.



AO72A
(Rev. 8/82)

*Patsy Cruse*

I'm married to Danny Cruse. He was sitting on the couch. We were arguing. I stayed in the kitchen.

Danny had just gotten over a cold. I was giving him hot toddies for the cold and he was taking shots. I said the wrong word. I was threatening to leave him and go back to Texas. I told him he had to quit drinking.

The argument got into pushing and shoving. I got slammed. When he gets wasted, he is like all men. He can't hold his liquor.

When I got hurt, my sister called the police. The police came. Two officers came. One of the officers was Young. The officers were being "straight up rude."

Young handcuffed Danny and he fell. The female officer grabbed me and arrested me. She was rude. I had a lighter. She said you can't be doing nothing.

We both went to jail. I heard Danny screaming and hollering. I was in the drunk tank. I heard a cop say I'm going to hurt you and heard a taser go off. Danny didn't tell me he got stung with a taser. He just said they held it close to his face.

Danny said he was being argumentative. Because he was argumentative, they made him get naked and put him in a cold place. He said he got body slammed to the floor more than once.

Danny got me out of jail the next morning at 7:30 a.m. or 8:00 a.m. As soon as I got out, we went straight to Sparks.

His elbow was awful. It was back and blue and swollen. It had fluid in it that was about as big as a tennis ball. It had to be drained more than once.



AO72A
(Rev. 8/82)

I went in with him at the hospital. He told them he tripped on the concrete. I don't think it was any of their business. I don't question him. He does what he does. He told me he wanted to talk to an attorney.

I took the photographs after we got out of Sparks. It was 12:30 p.m. or 1:00 p.m. that afternoon.

His elbow would freeze up for the first three weeks. He can't pick up anything heavier than fifteen to twenty pounds with the right arm.

***Patricia McMullen***

I'm Cruse's mother-in-law. I was in the house the day he was arrested. Patsy, Danny, Joann and Charles ("Chuck") were there.

I called the police the second time. They finally came out. When Danny pushed Patsy against the television, she slid down.

Young got to the house and tried to see what was going on. When my son-in-law came out of the bedroom, Young put his hand on his gun and got rude. I told him this is my house. I'll keep things under control. Well, I couldn't keep Danny under control.

Danny was on the couch. Patsy was in the kitchen. They were using hand signals to communicate. Young told them to quit talking. I turned Patsy around and told her to quit. Young yanked Danny off the couch and pushed him out. I didn't see Danny fall down.

A female officer took Patsy off. I followed the female officer and Patsy out. Joann and Chuck hadn't been drinking. I only had a couple. I hadn't been taking shots with Danny but was drinking vodka and orange juice.



AO72A
(Rev. 8/82)

Danny was being obnoxious, rotten, like a spoiled brat. I heard Patsy threaten to leave. I didn't go to the jail or the hospital.

***Officer Dewey Young***

I'm an officer with the Fort Smith Police Department. I recall the events at issue and do have an arrest report.

The arrest occurred on February 3, 2005. I received a call from dispatch about a domestic disturbance at that trailer. When I arrived, I saw the plaintiff near the street. He appeared to be intoxicated. He fell when I first came up and saw him outside the trailer.

When I got inside, I spoke to the mother first. I found out Cruse was involved. He had come into the house and sat on the couch. I was talking to the mother, the plaintiff, and his wife. I was there by myself. Huntington came out of the bedroom. It startled me.

I had everyone come out. I had five people in the living room area. Cruse and his wife started communicating with sign language. I made her face away so they couldn't talk to each other. I was being forceful. I was trying to control five people with my voice.

I was told there had been an altercation between Cruse and Patsy. She lifted her shirt up. I could see abrasions on her back. Cruse said the altercation was over her not giving him sex. She came over and started fumbling around on the couch with him.

This is when I decided it was time to get out of the house. Cruse and his wife were not listening and were fumbling around. He was very intoxicated. I had to help him off the couch. I had to support him.

I put Cruse in the back of the patrol car. I don't recall what Cruse was wearing. If Cruse had been injured during the arrest, I have to do an incident report. If he needs medical care, I



AO72A
(Rev. 8/82)

take him to the hospital. If he is injured and doesn't want medical care, I have to document that.

Cruse and his wife were both intoxicated. I'm not sure about the mother-in-law. The other two were not intoxicated.

I stayed while the female officer arrested Patsy and put her in a car. We drove off at the same time.

I brought Cruse to intake. I put my gun away and did the paperwork. I had nothing further to do with Cruse.

***Captain Mike Conger***

I'm the jail administrator at the SCDC. I was not present at the jail during Cruse's incarceration.

Once the swelling on Cruse's arm was noticed, he was taken to see the nurse. He was very combative so she could not treat him.

A detainee is put on suicide watch anytime he may be a harm to himself or others. The officers make a judgment call.

If the officers are certified, they can carry pepper spray and tasers. If a person is brought in on a public intoxication charge and we cannot get him to answer the booking questions, he is put into a holding cell. Depending on the individual's demeanor, he could be in the holding cell for four to six hours.

***Sgt. Justin Ritter***

I am a sergeant. I was working 7 p.m. to 7 a.m. When the Captain was not there, I was the ranking person on that shift.

I prepared a jail incident report regarding Cruse. This isn't something that really stood out in my mind.

When Cruse first came in, he went to H-1. There were other inmates in the cell. One of the inmates was Brian Jones. Cruse was in there only a few minutes and he started to fight with another inmate. This is why he was put into the enclosed recreation yard. It is approximately ten feet by twenty feet in size. It is not heated. It is the same temperature as the outdoors.

Cruse started cooperating so he was put back into a holding cell. He then started kicking the door and yelling and threatening inmates. He was taken to the recreation yard again.

When Cruse threatened to kill himself, he was placed in a suicide smock. A suicide smock is used to provide the detainees some privacy when their clothing is removed for their protection. I take any threat a detainee makes to injure himself seriously.

Cruse says he was thrown to the ground. This just didn't happen.

After Cruse said he was going to kill himself, I went down there and saw his elbow was swollen. Cruse said he had been beaten up by the jailers. He said he didn't know which ones.

He was taken to the nurse but he wouldn't cooperate. There were a number of jailers in there with Cruse and the nurse. Another jailer asked Cruse what happened, and he said he fell down.

From the nurse's station, Cruse was taken to the "rubber room." He was placed on suicide watch. He was checked at fifteen minutes intervals. When he was moved from one location to another, Cruse would have been placed in arm-bars. This is a control technique. After Cruse was in the rubber room for awhile, he went to be booked in.



AO72A
(Rev. 8/82)

***Darren Scott***

I was present on February 3, 2005, when Cruse was at the SCDC. I didn't write a report. After I read Ritter's report, I could recall the incident. The incident occurred at the beginning of my fourth month of employment at the SCDC. I hadn't finished my schooling.

When Cruse was brought in, he was put in the drunk tank. Four or five minutes later, he had an altercation with another inmate. We took him to the C-8 recreation yard. After a while, he cooled down. We took him back to H-1. He got into it again, and we put him back on the C-8 recreation yard.

On the night shift we have to do hourly checks. When I was passing the recreation yard, I heard him say: "If you guys are going to kill me, I'll kill myself first." I asked him to remove his pants. I gave him a suicide smock.

I noticed his elbow was swollen. I took him to the nurse. He was uncooperative. He was placed in HC-3 on suicide watch.

I don't recall deputies throwing Cruse on the ground. When we transport an inmate we use a control technique. We lock their wrists and put their arms behind their back. A deputy is on each side.

***Mike Restine***

I work at the SCDC. I'm a lance corporal. I was there on February 3rd and 4th, 2005.

I didn't write a report. I didn't recall the incident involving Cruse until I read Sgt. Ritter's report.



AO72A
(Rev. 8/82)

I recall at one point escorting Cruse to the C-8 recreation yard. I recall escorting him to the nurse and his being uncooperative. I only recall Cruse being taken to the recreation yard once.

To my knowledge, Cruse was not thrown on the ground. We are required to follow the use of force continuum. I didn't pinch Cruse and didn't see him get pinched.

***Wyatt McIntyre***

I'm a lance corporal. I've worked at the SCDC since July of 2001.

I didn't recall the incident involving Cruse until I read the reports. I remember something about his elbow. I'm drawing a blank on the whole thing. I didn't throw Cruse on the ground or pinch him. I do recall that.

***Frankie Stamps***

I'm a transport officer. In February of 2005, I was working pods at the SCDC. I worked there almost six years.

I only recall intaking Cruse. I logged his property in. His money, shoes, belt. When a detainee is released, we give back everything they came in with.

I know Cruse was not body slammed when he first came into the detention center. He was not pinched that I know of.

***The Exhibits***

Plaintiff's exhibit one consists of the medical records from Sparks Regional Medical Center. These records indicate Cruse was treated at the emergency room there on February 4, 2005, at 8:38 am. Cruse complained of right and left elbow pain from a fall that occurred just



AO72A
(Rev. 8/82)

prior to arrival. He reported falling that morning and hitting both his elbows on a cement floor. Cruse denied any other injuries.

Edema was noted in his right elbow and pain to both. A limited range of motion was noted in the right elbow and a decreased range of motion noted to his left elbow. X-rays of both elbows showed no overt fractures and normal alignment. He was diagnosed as having contusion and hematoma to both the right and left elbow.

His right elbow was put in a sling. He was prescribed Lorcet Plus for pain and told he could also take Motrin or Aleve. He was told to follow up with his family physician or with the emergency room in five days.

Plaintiff's exhibit two is a series of fifteen photographs of Cruse taken by his wife. The photographs reveal an edema or obvious swollen area on Cruse's right elbow. Bruising also appears on the inside of the arm a few inches above the right elbow joint and on the outside of the arm starting at the elbow joint and extending several inches below the right elbow joint.

Most of the photographs focus on Cruse's right elbow. Because of the large amount of tattooing on Cruse's left arm, it is difficult to tell whether his left elbow is swollen. It appears that it may be slightly swollen and in two of the photographs it looks like there may be some abrasions in the area of the elbow joint.

Joint exhibit one is the arrest report prepared by Young. It indicates Cruse was arrested on February 3, 2005, at 7:45 p.m. and charged with public intoxication. The arrest narrative indicates, among other things, that when Young responded to the domestic disturbance he observed Cruse standing in the street in front of trailer #52. Upon contact, Young states he



AO72A
(Rev. 8/82)

noticed a strong odor of intoxicants about Cruse's person, his speech was slurred, and he fell down when he tried to walk.

Defendants' exhibit 1 contains a number of documents from the SCDC file on Cruse. The first document is an affidavit for probable cause determination completed by Young. It indicates that when Young responded to a domestic disturbance call he located Cruse standing by the street. Young states Cruse had a strong odor of intoxicants about his person and fell down when he walked.

Other documents in this exhibit indicate Cruse arrived at the SCDC at 7:51 p.m. and was booked in on February 4, 2005, at 2:04 a.m. He was released on signature bond on February 4, 2005.

Defendants' exhibits two and three indicate Cruse was placed in a hospital/holding cell designated HC-3 on fifteen minute checks because he threatened suicide. A medical activity log indicates Cruse was checked at the following times: 23:46 (walking around yelling); 00:03 (laying on floor); 00:27 (asleep); 00:47 (asleep); 01:05 (asleep); 01:17 (asleep); 01:25 (asleep); 01:42 (asleep); 01:53 (asleep); 02:02 (out to booking).

Defendants' exhibit five indicates Cruse was seen by Christy Collier, a licensed practical nurse, on February 4, 2005. Collier indicates Cruse was very intoxicated when he was brought in. She states the officers told her Cruse was so drunk that he fell down prior to coming to the jail. When he was in the cell prior to being booked in, Collier reports that Cruse was banging on the door, yelling and cursing. Cruse said that he had broken his arm so he was brought to the nurse's station.



AO72A
(Rev. 8/82)

Collier indicated Cruse was very uncooperative, was cursing, and being disrespectful. She noted that his right arm just below his elbow was notably swollen and some purple discoloration could be seen. Cruse had full range of motion of his arm. In fact, Collier noted that he had been able to throw his pants at the deputies when he was placed in H-3 for his own safety and continued to bang on the door with his right arm. Collier reported she was unable to treat Cruse because of his uncooperative behavior.

Defendants' exhibit six is Justin Ritter's report. The report indicates Ritter had been informed by Deputy Scott that Cruse had threatened to hang himself. Ritter's report provides in pertinent part as follows:

> Once here he was placed in H-1 after being intaken. After about 5 minutes inmate Daniel Cruse attempted to fight with inmate Brian Jones. He was yelling and cursing at the others in H-1. Inmate Cruse was removed from H-1 and placed on the C-8 recyard due to his behavior towards other inmates. Inmate Cruse's behavior towards deputies was extremely bad. Over and over again he cursed deputies and refused to cooperate in any way. Inmate Cruse became irate when placed on the recyard and began banging and hitting on the door. After quite a while inmate Cruse quieten down and was moved back to H-1. Deputies watched him push himself up with both arms to get up. He then began to claim that deputies "Beat his ass" and broke his arm. Inmate Cruse was relocated back to H-1. After several minutes inmate Cruse again began to threaten the inmates located in H-1 and again began to curse and punch the door. Inmate Cruse was again removed from H-1 for the safety of the inmates. Inmate Cruse was placed in arm bars and relocated back to C-8 as he struggled with deputies the entire time. After several minutes inmate Cruse again began to punch on the door and curse deputies. I was then notified by deputy Scott that inmate Cruse was threatening to hang himself. I went to C-8 with Deputies and began to speak to inmate Cruse. I noticed that his right arm, right below the elbow was swollen. I asked him how it happened and he stated that he was beaten by deputies. I asked him who was the deputies who had done it and he stated that he did not know. I asked him when this had happened and he then changed his story and stated that he had fallen down and hurt his elbow. I asked when he had fallen. He refused to cooperate any further. I called RN2 Christy Collier to check on his arm. Inmate Cruse only would tell her that he was not suicidal and that he did not want to go on suicide watch. Inmate Cruse was then dressed in an anti-suicide smock and taken to the nurse's station to be checked further. RN 2



AO72A
(Rev. 8/82)

> Collier began to check on Inmate Cruse's arm making him do some movement tests. Deputy Mcintyre began to question him again as to when he had hurt it. Inmate Cruse was very uncooperative and would not give deputies a straight answer. Due to him refusing to cooperate he was placed back in Hc-3 on a 15 minute suicide watch.

Defendants' exhibit eight consists of the records from Sparks Regional Medical Center dated September 14, 2004, through May 6, 2005. Defendants' exhibit ten is the SCDC policy regarding health care services for detainees.

Defendants' exhibit eleven is the SCDC's policy on suicidal detainees. Among other things, it states that detainees placed on suicide status will not be allowed any items of personal property and will only be allowed a county-issued suicide smock and a blanket.

Defendants' exhibit twelve is the SCDC's policy regarding the use of force. The policy provides, among other things, that officers will use the minimum amount of non-deadly force necessary to maintain security and control of inmates.

## II. DISCUSSION

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). "[T]he constitutional standard applied may vary depending upon whether the victim is an arrestee, a pretrial detainee, or a convicted inmate of a penal institution." *Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001).

"If the victim is an arrestee, the Fourth Amendment's 'objective reasonableness' standard controls. The evaluation of excessive-force claims brought by pre-trial detainees, although



AO72A
(Rev. 8/82)

grounded in the Fifth and Fourteenth Amendments rather than the Fourth Amendment, also relies on an objective reasonableness standard." *Andrews*, 253 F.3d at 1060.

In this case, Cruse was in the SCDC because he had been arrested on a public intoxication charge. The alleged use of excessive force occurred while Cruse was being held at the SCDC but prior to his being booked in. Cruse, however, was no longer in the custody of the arresting officer and was being held at a detention facility based on the existence of the criminal charge against him.

There is no "bright line dividing the end of the arrestee's status and the beginning of the pre-trial detainee's status." *Andrews*, 253 F.3d at 1060-61. *See e.g., Moore v. Novak*, 146 F.3d 531 (8th Cir. 1998)(Fourth Amendment applied to excessive force claim involving use of force at a jail against an arrestee who was being violent and disruptive during the booking process). Typically, "[p]re-trial detainees are those individuals who the government has probable cause to believe have committed crimes. *Gerstein v. Pugh*, 420 U.S. 103, 114, 95 S. Ct. 854, 863, 43 L. Ed. 2d 54 (1975). They are confined pending trial, either because there is cause to believe that they are dangerous or because they cannot afford to make bail." *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989).

In Cruse's case, his status appears to be more likely that of an arrestee than a pre-trial detainee. However, despite the distinctions made between the status of arrestees and pre-trial detainees, the courts generally analyze excessive force claims of both in the same way. *Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001)("The evaluation of excessive-force claims brought by pre-trial detainees, although grounded in the Fifth and Fourteenth Amendments rather than the Fourth Amendment, also relies on an objective reasonableness standard."). The use of force



AO72A
(Rev. 8/82)

must be necessary to some legitimate institutional interest such as safety, security, or efficiency, and the force used must not be in excess of that reasonably believed necessary to achieve those goals. *Schoemehl*, 878 F.2d at 1048. The relevant inquiry being whether the officials behaved in a reasonable way in light of the facts and circumstances confronting them. *See e.g., Wilson v. Williams*, 83 F.3d 870, 875 (7th Cir. 1996).

As summarized above, Cruse maintains that he excessive force was used against him on at least four separate occasions while he was at the SCDC. First, he contends shortly after he was brought to the SCDC he was slammed to the floor and "dog piled" on by between three and five officers. Second, he contends when he was in a holding cell with other inmates, his hair was pulled and a taser stuck in his face. Third, when his pants were taken away and he threw them at the officers, Cruse maintains the officers "dog piled" on him again. Fourth, he contends officers threw him ten feet into the air and allowed him to fall onto the concrete floor below.

We find that Cruse has failed to establish that excessive force was used against him by the defendants. We find Cruse's testimony not credible for a number of reasons. First, Cruse cannot identify a single officer involved in the alleged use of excessive force. Cruse has made no showing that the named defendants were personally involved in or had any knowledge of the alleged use of excessive force. *See e.g., Givens v. Jones*, 900 F.2d 1229, 1233 (8th Cir. 1990)(respondeat superior cannot apply to a § 1983 action). In short, there is no basis in the record on which any of the named defendants can be held liable. *See e.g., Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995)(Section 1983 liability requires personal involvement or an allegation that the supervisor had knowledge of the unconstitutional conduct and turned a blind eye to it.).



AO72A
(Rev. 8/82)

Second, no testimony supports Cruse's assertion that excessive force was used against him on multiple occasions at the SCDC. Not a single witness who was called to testify verified, or supported, in anyway Cruse's testimony that excessive physical force was used against him.

Third, while Ritter testified Cruse initially said he had been beaten by deputies, he also said Cruse, when asked to supply details such as the names of the deputies involved, changed his story and stated he had fallen down and hurt his elbows. Fourth, Nurse Collier's report contains no mention of Cruse alleging he had been beaten. When Cruse was treated at the hospital the morning after his release, he did not mention to the medical personnel there that police officers had used excessive force against him. Instead, he indicated he had fallen on cement striking both elbows.

The court finds it difficult to believe Cruse did not mention, particularly in the requests for medical treatment, the multiple uses of excessive force he contends occurred including his being thrown ten feet into the air. Cruse was not accompanied by any law enforcement personnel when seen at the hospital and would have no reason to conceal from medical personnel the details regarding how his injuries were sustained.

It obvious Cruse did sustain some injuries to his elbows. As was mentioned in the emergency room records, the right elbow in particular was swollen and he had a decreased range of motion in both elbows. The mere fact of the injury, however, does not suggest the injuries resulted from the use of force by the named defendants. The injuries could have occurred in any number of ways. Nor does the mere fact that an injury occurred establish that it happened while Cruse was incarcerated at the SCDC. The injuries could have occurred prior to the arrest and the outward physical signs not manifested themselves until he was incarcerated.



AO72A
(Rev. 8/82)

Furthermore, while the injuries could have resulted from a confrontation between Cruse and one or more of the defendants or some other officers, the injuries could also have resulted from Cruse's own actions. It is undisputed that Cruse fell before, or immediately after, his arrest. It is also undisputed that once at the SCDC Cruse was beating and banging on the cell door. No evidence was submitted suggesting the injuries were somehow the result of Cruse being thrown in the air and having fallen to a cement floor as opposed to being caused in some other way. The evidence falls far short of establishing that Cruse's injuries were inflicted by one or more of the defendants or that one or more of the defendants used excessive force against Cruse.

## III. CONCLUSION

I therefore recommend that judgment be entered in the defendants' favor and the complaint be dismissed with prejudice.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 21st day of March 2006.

/s/ Beverly Stites Jones
UNITED STATES MAGISTRATE JUDGE



AO72A
(Rev. 8/82)